**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
<u>**HOUSTON DIVISION**</u>

| | |
|---|---|
| DEWAYNE BROOKS, SUSAN CAMERON, CHRISTENE JONES, JOSHUA WELLS, individually and on behalf of all others similarly situated, ) ) ) ) | **CIVIL ACTION NO.: 4:24-cv-2940** |
| Plaintiffs, ) ) | |
| v. ) ) | |
| CENTERPOINT ENERGY, INC., THE BOARD OF DIRECTORS OF CENTERPOINT ENERGY, INC., THE BENEFITS COMMITTEE OF CENTERPOINT ENERGY, INC., and JOHN DOES 1-10 ) ) ) ) ) ) ) | |
| Defendants. ) | |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiffs, DeWayne Brooks, Susan Cameron, Christene Jones, and Joshua Wells ("Plaintiffs"), by and through their attorneys, on behalf of the CenterPoint Energy Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.     INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include CenterPoint Energy, Inc. ("CenterPoint" or "Company") and the

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Board of Directors of CenterPoint and its members during the Class Period[2] ("Board"), and the Benefits Committee of CenterPoint Energy, Inc. and its members (the "Committee") during the Class Period, for breaches of their fiduciary duties.

2.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Ma Kujanek v. Houston Poly Bag I Ltd.,* 658 F.3d 483 at 489 (5th Circuit 2011), *Martin on Behalf of Cal–Tex Protective Coatings v. Frail*, 2011 WL 13175089 at *14 (W.D. Tex. 2011), *Main v. American Airlines Inc.,* 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

3.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers," including providers of plan the Plan's administrative and recordkeeping ("RKA") services.[3]

4.      With regard to plan fees, the DOL states "You should know that your employer also must consider the fees and expenses paid by your plan."[4]

5.      At all times during the Class Period, the Plan had at least $2 billion dollars in assets under management. At the end of fiscal year 2022 and 2021, the Plan had over $2.37 billion dollars

---

[2] The Class Period, as will be discussed in more detail below, is defined as August 7, 2018 through the date of judgment.

[3] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

[4] *Id.*

(*see* Schedule H attached to 2022 Form 5500, at 2) and $3.07 billion dollars (*see* Schedule H attached to 2021 Form 5500, at 2), respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

6.      The Plan is also large in terms of the number of its participants. At the end of fiscal year 2022 and 2021, the Plan had 12,390 participants (*see* 2022 Form 5500, at 2) and 11,975 participants (*see* Schedule H attached to 2021 Form 5500, at 2), respectively.

7.      Accordingly, the Plan had substantial bargaining power to negotiate favorable recordkeeping and administration fees. Plans, such as the Plan, with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

8.      The Plan's assets under management makes it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2020, only 0.1 percent (892 of 603,217) of Plans in the country had more than $1 billion in assets under management.[5] In addition, this was true at the start of the Class Period in 2018 where only 0.1 percent (659 of 586,622) of 401(k) plans in the country were as large as the Plan.[6] As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses charged for RKA services. Defendants, however, did not try to reduce the Plan's expenses to ensure they were prudent.

9.      Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached

---

[5]  *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2020 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf.

[6]  *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf.

the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to control the Plan's RKA costs.

10.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

11.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

13.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

14.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

**Plaintiffs**

15.    Plaintiff, DeWayne Brooks ("Brooks"), resides in Nacogdoches, Texas. During his employment, Plaintiff Brooks participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Brooks suffered injury to his Plan account by overpaying for his share of RKA costs.

16.    Plaintiff, Susan Cameron ("Cameron"), resides in Houston, Texas. During her employment, Plaintiff Cameron participated in the Plan paying the RKA costs associated with her Plan account and was subject to the excessive RKA costs. Cameron suffered injury to her Plan account by overpaying for her share of RKA costs.

17.    Plaintiff, Christene Jones ("Jones"), resides in Missouri City, Texas. During her employment, Plaintiff Jones participated in the Plan paying the RKA costs associated with her Plan account and was subject to the excessive RKA costs. Jones suffered injury to her Plan account by overpaying for her share of RKA costs.

18.    Plaintiff, Joshua Wells ("Wells"), resides in Woodbury, Minnesota. During his employment, Plaintiff Wells participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Wells suffered injury to his Plan account by overpaying for his share of RKA costs.

19.    Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

20.    Plaintiffs did not have knowledge of all material facts (including, among other things, recordkeeping cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

21.    CenterPoint is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business at 1111 Louisiana Street, Houston, Texas. *See* the 2022 Form 5500 at 1. CenterPoint "is a domestic energy delivery company that includes electric transmission & distribution, natural gas distribution and energy services operations. With more than 8,900 employees, CenterPoint Energy and its predecessor companies have been in business for more than 140 years."[7]

22.    CenterPoint appointed the Committee to, among other things, ensure that the Plan paid a reasonable rate for RKA services given the size of the Plan. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

23.    Accordingly, CenterPoint during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

24.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

---

[7]  https://www.centerpointenergy.com/en-us/corporate last accessed on July 24, 2023.

**Board Defendants**

25.     CenterPoint, acting through its Board of Directors, among other things, is charged with ensuring that the Plan had no more expense than reasonable and/or paid a reasonable rate for RKA services given the size of the Plan. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

26.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

27.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

28.     As discussed above, CenterPoint and the Board appointed the Committee to, among other things, ensure that the Plan had no more expense than reasonable and/or paid a reasonable rate for RKA services given the size of the Plan. Under ERISA, individuals or entities that exercise discretionary authority over management or disposition of plan assets are considered fiduciaries.

29.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan assets.

30.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

31.     To the extent that there are additional officers, employees and/or contractors of CenterPoint who are/were fiduciaries of the Plan during the Class Period, or were hired as Plan consultants during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 41-50 include, but are not limited to, CenterPoint officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

### IV.     CLASS ACTION ALLEGATIONS[8]

32.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[9]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between August 7, 2018 through the date of judgment (the "Class Period").

---

[8] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[9] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

33.     The members of the Class are so numerous that joinder of all members is impractical. The 2022 Form 5500 lists 12,390 Plan "participants with account balances as of the end of the plan year." *See* 2022 Form 5500 at 2.

34.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated the Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

35.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duties of prudence by engaging in the conduct described herein;

C.     Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

36.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no

interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

37.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

38.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

39.     Houston Industries Incorporated ("HII"), "established a tax-qualified defined contribution plan, effective July 1, 1973, for the benefit of its eligible employees (the "Saving Plan"), along with a trust, which formed a part of the Savings Plan. *See* CenterPoint Energy Savings Plan (As Amended and Restated Effective January 1, 2021), at 1.

40.     Effective January 1, 1989, the Savings Plan was amended to comply with the requirements of Section 401(a) of the Internal Revenue Code of 1986, as amended by the Tax

Reform Act of 1986, and Code Section 501(a) with respect to the underlying Savings Plan trust, and to make certain other changes. *Id.*

41.     Effective October 5, 1990, the Savings Plan was amended and restated to include an employee stock ownership plan ("ESOP") intended to qualify under Code Sections 401(a) and 4975(e)(7). *Id.*

42.     Effective July 1, 1995, the Savings Plan was amended and restated to make certain additional changes (the Savings Plan, as amended and restated effective July 1, 1995, and as thereafter amended and in effect on March 31, 1999, being herein referred to as the "Prior HII Plan"). *Id.*

43.     Effective August 6, 1997, as a result of a corporate merger, HII assumed the sponsorship of the NorAm Employee Savings & Investment Plan (the "NorAm Plan") and the Minnegasco Division Employees' Retirement Savings Plan (the "Minnegasco Plan"), and adopted the underlying plan trusts. *Id.*

44.     Effective April 1, 1999, the NorAm Plan and Minnegasco Plan were merged with and into the Prior HII Plan, and the assets and liabilities under the NorAm Plan and Minnegasco Plan trusts were transferred to the Savings Plan trust, and the Prior HII Plan was amended and restated: (1) to reflect the same, (2) to incorporate all prior amendments to the Prior HII Plan, including the amendments incorporating certain changes required by the Retirement Protection Act of 1994 under the General Agreement on Tariffs and Trades, the Uniformed Services Employment and Reemployment Rights Act, the Small Business Job Protection Act of 1996 and the Tax Reform Act of 1997, (3) to reflect the change in the name of the Plan sponsor from Houston Industries Incorporated to Reliant Energy, Incorporated ("REI"), and (4) to make certain other changes to the Prior HII Plan (the "1999 Plan"), with such 1999 Plan subsequently amended to

reflect the applicable provisions of the Community Renewal Tax Relief Act of 2000, the Economic Growth and Tax Relief Reconciliation Act of 2001 and the Job Creation and Worker Assistance Act of 2002. *Id*.

45.     Effective August 31, 2002, in connection with the spin-off of Reliant Resources, Inc. ("RRI"), a subsidiary of REI, and the resulting reorganization of REI, CenterPoint Energy, Inc. became the plan sponsor of the 1999 Plan, which was renamed the CenterPoint Energy, Inc. Savings Plan. *Id*.

46.     Effective January 1, 2009, the 2005 Plan was amended and restated to: (1) incorporate all prior amendments to the 2005 Plan, including the addition of automatic enrollment provisions for eligible employees hired on and after January 1, 2008, (2) change the employer matching contribution formula, (3) satisfy the "safe harbor" plan requirements under Code Section 401(k)(12), and (4) make certain design changes, (the "2009 Plan"). *Id*.

47.     Effective, January 1, 2015, the 2009 Plan was amended and restated to (1) incorporate all prior amendments to the 2009 Plan, (2) amend the definition of "Spouse" to reflect the Supreme Court's decision regarding same-sex marriage in *United States v. Windsor* and to comply with IRS Notice 2014-19 and other guidance issued by the Internal Revenue Service concerning the same, and (3) make certain changes to the hardship withdrawal provision and confirm the limitation period to file a claim for benefits (the "2015 Plan"). *Id*.

48.     Effective January 1, 2016, the 2015 Plan was amended and restated to: (1) effective October 1, 2015, implement Roth deferral contribution features and comply with Code Section 402A, and (2) effective January 1, 2016, (a) revise the Plan's automatic enrollment provisions, (b) add partial distributions as an optional form of payment, (c) revise the Plan's provisions related to mandatory cash outs, (d) provide that contributions may only be made with respect to eligible

compensation paid within 30 days of termination of employment, (e) add a period of limitation following final denial of a participant's benefit claim for purposes of filing a civil action, (f) clarify the determination of eligibility to participate in the Plan, (g) clarify the standard of judicial review applicable to Company Benefit Committee actions, (h) adopt certain restrictions on investment elections in the ESOP Company Stock Fund, and (i) provide the Chief Executive Officer of the Company with amendment authority, subject to certain limitations, (the "2016 Plan"). *Id.*

49.     Effective January 1, 2020, the Vectren Corporation Retirement Savings Plan (the "Vectren Plan") was merged with and into the 2016 Plan, the assets and liabilities under the Vectren Plan were transferred to the 2016 Plan trust, and the 2016 Plan was amended and restated (1) to reflect the merger of the plans, (2) to incorporate all prior amendments to the 2016 Plan, and (3) to amend the hardship provisions of the 2016 Plan (the "Prior Plan"). *Id.*

50.     "The Plan is a defined contribution plan and it bases benefits solely on the amounts in each participant's individual account." *See* Summary Plan Description ("SPD"), at 32; *see also* Independent Auditors' Report attached to 2022 Form 5500, at 5 ("The Plan is a defined contribution plan established in accordance with Sections 401(a) and 401(k) of the Internal Revenue Code of 1986, as amended (IRC), and is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA).").

### *Eligibility*

51.     In general, regular full-time employees are eligible to participate in the Plan from their first day of service. *See* SPD, at 4 ("You are eligible to participate in the Savings Plan on your first day of work if you meet Plan eligibility requirements.").

*Contributions*

52.     There are several types of contributions that can be added to a participant's account, including: a percentage of eligible pay each pay period on a pre-tax and/or a Roth 401(k) bases and a percentage of eligible pay each pay period with after-tax dollars. *See* SPD at 5.

53.     With regard to employee contributions in the Plan: "[p]articipants may make pre-tax and/or Roth contributions up to 50% of eligible compensation, not to exceed the Internal Revenue Service (IRS) limits as defined in the Plan." *See* 2022 Auditor Report at 6. CenterPoint "matches 100% of the first 6% of eligible compensation contributed by a Participant to the Plan (excluding catch-up contributions)." *See* 2022 Auditor Report at 6.

54.     Like other companies that sponsor 401(k) plans for their employees, CenterPoint enjoys both direct and indirect benefits by providing matching contributions to the Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

55.     CenterPoint also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

56.     Given the size of the Plan, CenterPoint likely enjoyed significant tax and cost savings from offering a match.

*Vesting*

57.     Participants are immediately vested in all contributions whether they were made by the employee or whether the contribution was a matching contribution made by CenterPoint. *See*

2022 Auditor's Report ("Participants are vested immediately in their elective contributions plus earnings thereon. Participants, other than certain bargaining unit employees, are also immediately fully vested in all Company contributions and actual earnings thereon.").

### The Plan's Investments

58.     The Plan's assets under management for all funds as of December 31, 2022 was $2,373,434,811. *See* Schedule H, attached to 2022 Form 5500, at 2.

### Payment of Plan Expenses

During the Class Period, administrative expenses, including recordkeeping fees, were paid for using the Plan's assets. *See* 2022 Auditor Report at 9.

## VI.     THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

**A.     The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Failed to Administer the Plan in a Prudent Manner**

59.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

60.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).

61.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.

### ERISA's Fee Disclosure Rule

62.     In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed

plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [10]

63.    The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

64.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet.

65.    The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

66.    A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

67.    Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants. Among

---

[10]  *See* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf    ("DOL    408(b)(2) Regulation Fact Sheet")

other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

**B.    Costs for Recordkeeping Services Vary Little for a Plan with a Substantial Number of Participants**

68.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

69.    There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A.    Recordkeeping;

B.    Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C.    Administrative services related to converting a plan from one recordkeeper to another;

D.    Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E.    Maintenance of an employer stock fund (if needed);

F.    Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G.    Plan consulting services, including assistance in selecting the investment lineup offered to participants;

H.    Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s (excluding the separate fee charged by an independent third-party auditor);

I.    Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

J.    Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

70.    This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

71.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

A.    Loan processing;

      B.      Brokerage services/account maintenance (if offered by the plan);

      C.      Distribution services; and

      D.      Processing of qualified domestic relations orders.

72.      All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

73.      The cost of providing recordkeeping services often depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases." 10 Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

74.      In general, the level, number and character of participant services provided by the record keeper have minimal impact upon the costs of providing record keeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

75.      The incremental costs caused by additional participants may include: Mailing costs, if materials are delivered by mail versus Internet; telephone inquiries through an 800 number; check distributions from the 401(k) plan to the participant; and/or any in person or off line participant

education and investment guidance requiring the personnel time of a record keepers staff member. This service is normally charged as an additional line-item cost.

76.     Although the 401(k) participant servicing can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan. ***Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.***

77.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

78.     The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g*., website, call center, and some print services). These costs also do not materially change if the recordkeeper gains a new plan or loses an existing plan, and don't vary based on the amount of assets in the plan or in an individual's account.

79.     The way it works, in part, is that each participant's account incurs transactions such as contributions, distributions, asset allocation changes, and less frequently, loans and distributions and participant reports. Each participant's account balance is updated daily, reflecting the aforementioned activities as well as investment returns. In this manner a participant's account is somewhat similar to a simplified brokerage account with only a few investment positions. As a

result, the cost of recordkeeping a participant's account with a balance of $500,000 is the same as for a participant whose account balances is $5,000 in the same plan.

80.     The cost of providing recordkeeping services thus often depends on the number of participants in a plan.

81.     When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increase, the average cost per participant decreases. *See*, 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.")[11] ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[12]

82.     Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

**C.     Much Information Regarding the Reasonableness of Fees for Recordkeeping Services are in the Sole Possession of Defendants**

83.     As noted above, 408(b)(2) disclosures provided to plan sponsors and fiduciaries are generally not made available to plan participants. The same is true for Plaintiffs and this Plan, as

---

[11] *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.

[12] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013).

Plaintiffs do not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

84.    Other information has also not been made available to Plaintiffs. For example, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

85.    Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[13]

86.    Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information.

87.    Additionally, documentation of fiduciary fee monitoring is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered

---

[13] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

for the fiduciary review, and (iii) the rationale for resulting investment decisions. Any related documents or data considered for purposes of the investment review (*e.g.*, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized. Without proper documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

88.    In an attempt to discover the details of the Plan's mismanagement, on August 3, 2023, the Plaintiffs wrote to CenterPoint requesting, *inter alia*, meeting minutes from the Committee. By correspondence dated September 1, 2023, CenterPoint denied this request.

89.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that's not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

90.    In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without

pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

91.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

92.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and recordkeeping fees which wasted the assets of the Plan and the assets of participants.

**D.    Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable Recordkeeping Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Recordkeeping Fees**

93.    Effective January 1, 2005, CenterPoint entered into a Trust Agreement with The Northern Trust Company ("Northern Trust") to, among other things, provide recordkeeping for the Plan. *See* CenterPoint Energy Savings Trust, Amended and Restated Effective January 1, 2005 ("2005 Trust Agreement"). Voya Institutional Plan Services, LLC ("Voya") was the recordkeeper for the Plan at all times during the Class Period.[14]

94.    During the Class Period, Voya was one of the top recordkeepers nationally as measured by assets being recordkept. For example, in 2020 Voya ranked as follows:

**2020 TOP PROVIDERS (RECORDKEEPERS)[15]**

| Top 10, by Total 401(k) Assets ($MM) | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |

---

[14] Voya has served as the Plan's recordkeeper since 2017. *See* 2017-2022 Forms 5500.

[15] *See* https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/

| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

95.     The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena.

96.     Voya is responsible for maintaining detailed records of the money in Plan participants' accounts, "including how much is contributed, how it is invested, what the earnings and/or losses have been and what amounts have been distributed." *See* SPD, at 8

**1.    There is No Indication Defendants Negotiated to Reduce the Plan's Recordkeeping Fees During the Class Period**

97.     As noted above, 408(b)(2) disclosures are not available to plan participants. By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either. Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP.

98.     Here it appears the Defendants failed to conduct a RFP in the years leading up to the start of the putative Class Period. The fact that the Plan had the same recordkeeper in place, namely Voya, since 2017 with little meaningful change in the already excessive RKA rate plausibly suggests that the Plan fiduciaries failed to act in the best interests of Plan participants when they failed to genuinely attempt to seek a competitive market rate for RKA fees. Had the Defendants genuinely sought a competitive rate, the Plan participants would have benefited from

a significant reduction in RKA costs given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

99.    At any point in the Class Period, the Plan's fiduciaries could have opted to conduct a RFP to any recordkeeper including any of the above top ten recordkeepers who were peers of Voya and capable of providing lower recordkeeping fees. Had Defendants sought an appropriate market rate through a RFP, it's likely either the recordkeeper would have been changed at some point or Voya would have agreed to charge much less per participant for RKA services throughout the Class Period.

    **2.**    **The Plan's Recordkeeping Fees were/are Unreasonable When Benchmarked Against Other Similarly Situated Plans and Within the Context that Plan Recording Fees Should Decline as Plan Size Increases**

100.    During the Class Period, the Plan's per participant total RKA fees were as follows:

| Year | Participants (PP) | Total Direct Costs[16] | Voya Per Participant Charge (PPC) |
|------|------|------|------|
| **2018** | 9,802 | $1,827,018.00 | $186.39 |
| **2019** | 10,119 | $2,179,086.00 | $215.35 |
| **2020** | 11,417 | $2,247,028.00 | $196.81 |
| **2021** | 11,975 | $2,590,570.00 | $216.33 |
| **2022** | 12,390 | $2,176,217.00 | $175.64 |

101.    At all times during the Class Period, the above fees were unreasonable. As noted above, a DOL study concluded that "[b]asic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases." Accordingly, the larger the plan, the lower the recordkeeping fee should be.

---

[16] As reported in Schedule H of the of the Plan's Form 5500. These amounts also appear in Schedule C of the Form 5500s and the service codes associated with these charges are 13 (contract administrator) and 64 (Recordkeeping fees).

102.    To put things into perspective, when comparing retirement plan data, most publications utilize tranches. For example, the leading publication that collects 401(k) data is BrightScope/ICI. It categorizes plans in the following tranches:

EXHIBIT I.2
**Universe of 401(k) Plans**
Distribution of 401(k) plans, participants, and assets by plan assets or number of plan participants, 2018

| Plan assets | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| | Number | Percent | Thousands | Percent | Billions of dollars | Percent |
| Less than $1M | 343,108 | 58.5% | 6,007.5 | 8.4% | $107.1 | 2.1% |
| $1M to $10M | 208,789 | 35.6 | 13,660.6 | 19.1 | 620.7 | 12.2 |
| >$10M to $50M | 26,458 | 4.5 | 9,894.5 | 13.9 | 532.4 | 10.4 |
| >$50M to $100M | 3,564 | 0.6 | 4,808.0 | 6.7 | 247.1 | 4.8 |
| >$100M to $250M | 2,407 | 0.4 | 6,744.8 | 9.5 | 374.7 | 7.3 |
| >$250M to $500M | 1,034 | 0.2 | 5,395.1 | 7.6 | 362.1 | 7.1 |
| >$500M to $1B | 603 | 0.1 | 4,763.9 | 6.7 | 424.1 | 8.3 |
| More than $1B | 659 | 0.1 | 20,073.4 | 28.1 | 2,439.7 | 47.8 |
| All plans | 586,622 | 100.0 | 71,347.7 | 100.0 | 5,108.0 | 100.0 |

| Number of plan participants | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| | Number | Percent | Thousands | Percent | Billions of dollars | Percent |
| Fewer than 100 | 522,277 | 89.0% | 10,960.2 | 15.4% | $709.2 | 13.9% |
| 100 to 499 | 50,477 | 8.6 | 9,841.2 | 13.8 | 549.9 | 10.8 |
| 500 to 999 | 6,375 | 1.1 | 4,424.5 | 6.2 | 266.1 | 5.2 |
| 1,000 to 4,999 | 5,807 | 1.0 | 12,136.0 | 17.0 | 886.3 | 17.4 |
| 5,000 to 9,999 | 842 | 0.1 | 5,828.1 | 8.2 | 506.0 | 9.9 |
| 10,000 or more | 844 | 0.1 | 28,157.8 | 39.5 | 2,190.4 | 42.9 |
| All plans | 586,622 | 100.0 | 71,347.7 | 100.0 | 5,108.0 | 100.0 |

Note: Assets are fair market value at the year-end of the plan and include loans. The results exclude 403(b) plans with a 401(k) feature.
Source: BrightScope Defined Contribution Plan Database

*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf. Accordingly, the billion-dollar asset mark is significant as all plans over a billion dollars are considered in a category of their own.

103.    Looking at recordkeeping costs for plans of a similar size during the Class Period shows that the Plan was paying higher recordkeeping fees than its peers:

| Recordkeeper | Plan Name | Plan Year | Assets > 1b | Assets < $1b | Participants | Cost per participant[17] |
|---|---|---|---|---|---|---|
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2019 | | $843,224,007 | 10,072 | $22 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2019 | | $435,391,716 | 14,698 | $23 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2019 | | $939,399,569 | 18,674 | $25 |
| Vanguard | Michelin 401(k) Savings Plan | 2019 | Yes | | 16,335 | $26 |
| Fidelity | First American Financial Corporation 401(K) Savings Plan | 2019 | Yes | | 15,246 | $35 |
| **Yoya** | **CenterPoint Plan** | **2019** | **Yes** | | **10,119** | **$215.35** |
| | | | | | | |
| Fidelity | Fortive Retirement Savings Plan | 2018 | Yes | | 13,502 | $35 |
| T. Rowe Price | Sanofi U.S. Group Savings Plan | 2018 | Yes | | 24,097 | $23 |
| Fidelity | Bausch Health Companies Inc. Retirement Savings Plan | 2018 | | $904,717,349 | 8,902 | $36 |
| Fidelity | Children's Medical Center of Dallas Employee Savings Plan 403(b) | 2018 | | $349,335,673 | 9,356 | $36 |
| T. Rowe Price | Ralph Lauren 401(k) Plan | 2018 | | $552,586,935 | 9,389 | $31 |
| Vanguard | Southern California Permanente Medical Group Tax Savings Retirement Plan | 2018 | | $773,795,904 | 10,770 | $31 |
| **Yoya** | **CenterPoint Plan** | **2018** | **Yes** | | **9,802** | **$186.39** |

104.    The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees. As of the end of 2018 there were only 844 401(k) plans with 10,000 or more participants. The Plan's $200.87 average per participant fee from 2018 to 2019 is more than six times the average fee of $29.36 per participant from 2018 to 2019 for the 11 plans listed above.

105.    This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years of the Class Period.  Indeed, the figures in the above chart is just an example of the

---

[17] Unless otherwise noted, these fees are taken from the Form 5500.

Plan's excessive RKA fees throughout the Class Period as the Plan had an average of $198.30 per participant fee from 2018 through 2022.

106.    The Plan should have been able to obtain per participant recordkeeping fees in the mid to upper $20 range per participant from Voya no later than the start of the Class Period based on its size and the routine nature of the recordkeeping services performed by Voya. As noted above, Voya largely offers the same services to its 401(k) clients. Any services beyond the routine are billed on top of the core charges. This fee range is consistent with the average recordkeeping fees paid by the largest plans in the country as demonstrated in the allegations above.

107.    The mid to upper $20 range per participant fee is not an exact fee that every Plan participant should have paid. To the extent Defendants collected recordkeeping fees through an asset-based percentage fee,  the amount participants paid for recordkeeping fees was a function of a percentage level and the assets in each participant's account. Meaning, the actual amounts paid by Plan participants varied according to the assets in their accounts.

108.    A lower dollar amount paid in fees is primarily reflective of a low balance in the participant's account. Therefore, if the average per participant fee was reduced to the mid to upper $20 range , the pro rata rates for all participants, including those that were paying less than the mid to upper $20 range , would drop proportionally according to the lever of assets in their accounts.

**3.    The Plan's Fiduciaries Failed to Consider All Fees Being Paid to Voya**

109.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper or recordkeepers.

110.    Prudent fiduciaries monitor the amount of the payments to a service provider to ensure that provider's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

111.    Here, in addition to the excessive amounts of money paid to Voya for recordkeeping services, it appears that the Plan also paid Alight/Tempo for performing recordkeeping services during the Class Period.  According to the Plan's Form 5500 filings, the following amounts were paid to Tempo/Alight:

| Year | Participants (PP) | Total Direct Costs[18] |
|------|-------------------|------------------------|
| 2018 | 9,802 | $80,775.00 |
| 2019 | 10,119 | $38,929.00 |
| 2020 | 11,417 | $10,800.00 |
| 2021 | 11,975 | $18,225.00 |
| 2022 | 12,390 | $20,475.00 |

112.    The above additional amounts paid to Tempo/Alight for recordkeeping services has no justification given the recordkeeping services already being provided by Voya.  It also served to mask the true cost of RKA services being paid by Plan participants (which was more than Voya was charging) because payments for RKA services was going to separate service providers.

113.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

---

[18] As reported in Schedule C of the of the Plan's Form 5500, the service code for these services is 15 (recordkeeping and information management (computing, tabulating, data processing, etc.).

## FIRST CLAIM FOR RELIEF
### Breach of Fiduciary Duty of Prudence
### (Asserted against the Committee)

114.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

115.    At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

116.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

117.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. The Prudence Defendants also failed to control the costs of the Plan's recordkeeping and administrative costs.

118.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

119.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must

restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

120.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against CenterPoint and the Board Defendants)**

121.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

122.    CenterPoint and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

123.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

124.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported

regularly to the Monitoring Defendants. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

125.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

126.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent monitoring of recordkeeping and administrative costs, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: August 7, 2024          **THE LAW OFFICE OF KELL A. SIMON**

*/s/ Kell A. Simon*
Kell A. Simon
Texas Attorney ID # 24060888
501 N. Interstate Highway 35, Suite 11
Austin, Texas 78702
Email: kell@kellsimonlaw.com
Telephone: (512) 898-9019
Fax: (512) 368-9144

**CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(*Pro Hac Vice* to be requested)
James A. Maro, Esquire
PA Attorney ID #86420
(*Pro Hac Vice* to be requested)
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
             jamesm@capozziadler.com
Telephone: (610) 890-0200
Fax: (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*