**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
<u>HOUSTON DIVISION</u>**

| | |
|---|---|
| DEWAYNE BROOKS, SUSAN CAMERON, CHRISTENE JONES, JOSHUA WELLS, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>   v.<br><br>CENTERPOINT ENERGY, INC.,<br><br>           Defendant. | **CIVIL ACTION NO.: 4:24-CV-2940** |

<u>**AMENDED COMPLAINT**</u>

Plaintiffs, DeWayne Brooks, Susan Cameron, Christene Jones, and Joshua Wells ("Plaintiffs"), by and through their attorneys, on behalf of the CenterPoint Energy Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

**I.     INTRODUCTION**

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciary, CenterPoint Energy, Inc. ("CenterPoint" or "Company"), during the Class Period,[2] for breaches of its fiduciary duties.

2.     To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] The Class Period, as will be discussed in more detail below, is defined as August 7, 2018 through the date of judgment.

"solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Ma Kujanek v. Houston Poly Bag I Ltd.,* 658 F.3d 483 at 489 (5th Circuit 2011), *Martin on Behalf of Cal–Tex Protective Coatings v. Frail*, 2011 WL 13175089 at *14 (W.D. Tex. 2011), *Main v. American Airlines Inc.,* 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

3.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers," including providers the plan's administrative and recordkeeping ("RKA") services.[3]

4.      With regard to plan fees, the DOL states "[y]ou should know that your employer also must consider the fees and expenses paid by your plan."[4]

5.      At all times during the Class Period, the Plan had at least $2 billion dollars in assets under management. At the end of fiscal year 2023 and 2022 the Plan had over $2.60 billion dollars (*see* Schedule H attached to 2023 Form 5500 at 2) and $2.37 billion dollars (*see* Schedule H attached to 2022 Form 5500 at 2), respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

6.      The Plan is also large in terms of the number of its participants. At the end of fiscal year 2023 and 2022, the Plan had 11,990 participants (*see* 2023 Form 5500 at 2) and 12,390 participants (*see* Schedule H attached to 2022 Form 5500 at 2), respectively.

---

[3] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

[4] *Id.*

7.    The Plan's assets under management makes it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2021, only 0.2 percent (1,011 of 641,747) of plans in the country had more than $1 billion in assets under management.[5] In addition, this was true at the start of the Class Period in 2018 where only 0.1 percent (659 of 586,622) of 401(k) plans in the country were as large as the Plan.[6]

8.    The marketplace for retirement plan services is established and competitive. Accordingly, as a jumbo plan, in addition to the large number of participants, the Plan had substantial bargaining power to obtain high-quality, low-cost administrative, recordkeeping and managed account ("RKA") services. The Plan's fiduciaries, however, did not try to reduce the Plan's expenses to ensure they were prudent. Rather, the Plan's fiduciaries allowed unreasonable expenses to be charged to participants for RKA services, including managed account services.

9.    Plaintiffs allege that during the putative Class Period, Defendant, as a "fiduciary" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to control the Plan's RKA costs.

10.    Defendant's mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Its actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

---

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

[6] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf.

11.     Based on this conduct, Plaintiffs assert claims against Defendant for breach of the fiduciary duty of prudence (Count One).

## II.    JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

13.     This Court has personal jurisdiction over Defendant because it transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

14.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendant resides and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiffs

15.     Plaintiff, DeWayne Brooks ("Brooks"), resides in Nacogdoches, Texas. During his employment, Plaintiff Brooks participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. During the putative Class Period, Mr. Brooks utilized the Professional Management service, an account management service, provided by Voya Retirement Advisors, LLC (VRA) and paid fees associated with the service. The service was an asset-based service, meaning the fees Mr. Brooks and others who utilized the service paid,

were based on the assets under management for the participant. For example, in the fourth quarter of 2018, Mr. Brooks paid a managed account fee of $35.74 based on assets under management of $26,447.54. In the fourth quarter of 2019 he paid a managed account fee of $58.43 based on assets under management of $55,341.79. Mr. Brooks held the identical investment funds in the fourth quarter of 2018 as the fourth quarter of 2019: Target Retirement 2055 Fund, Large Company Value Fund, S&P 500 Index Fund, Large Company Growth Fund, and International Equity Fund. Thus, Mr. Brooks paid 61% more in fees in 2019 than in 2018 for the same exact service. During the Class Period, Mr. Brooks suffered injury to his Plan account by overpaying for his share of RKA costs, which included the excessive costs for the managed account service.

16.     Plaintiff, Susan Cameron ("Cameron"), resides in The Woodlands, Texas. During her employment, Plaintiff Cameron participated in the Plan paying the RKA costs associated with her Plan account and was subject to the excessive RKA costs. Cameron suffered injury to her Plan account by overpaying for her share of RKA costs.

17.     Plaintiff, Christene Jones ("Jones"), resides in Missouri City, Texas. During her employment, Plaintiff Jones participated in the Plan paying the RKA costs associated with her Plan account and was subject to the excessive RKA costs. Jones suffered injury to her Plan account by overpaying for her share of RKA costs. During the Class Period, Ms. Jones also utilized the Professional Management service provided by VRA and paid fees associated with the service. She was harmed by overpaying for the managed account service and other RKA services provided to the Plan participants.

18.     Plaintiff, Joshua Wells ("Wells"), resides in Saint Paul, Minnesota. During his employment, Plaintiff Wells participated in the Plan paying the RKA costs associated with his

Plan account and was subject to the excessive RKA costs. Wells suffered injury to his Plan account by overpaying for his share of RKA costs.

19.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendant's unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as described herein.

20.     Plaintiffs did not have knowledge of all material facts (including, among other things, recordkeeping cost comparisons to similarly-sized plans) necessary to understand that Defendant breached its fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### **Defendant**

21.     CenterPoint is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business at 1111 Louisiana Street, Houston, Texas. *See* the 2023 Form 5500 at 1. CenterPoint "is a domestic energy delivery company that includes electric transmission & distribution, natural gas distribution and energy services operations. With more than 8,900 employees, CenterPoint Energy and its predecessor companies have been in business for more than 140 years."[7]

22.     CenterPoint, through its Board of Directors, appointed the Benefits Committee of CenterPoint Energy, Inc. (the "Committee") to, among other things, ensure that the Plan paid a reasonable rate for RKA services given the size of the Plan. *See* CenterPoint Energy Savings Plan, Summary Plan Description, January 2022 (the "SPD") at 8. As will be discussed below, the

---

[7]  https://www.centerpointenergy.com/en-us/corporate last accessed on July 24, 2023.

Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

23.     The Committee and its members are not identified as a defendant in this action. Pursuant to the CenterPoint Energy Savings Plan, as amended and restated effective January 1, 2021 (the "Plan Document" or "Plan Doc."), the Company indemnifies the Committee against any liability arising from services provided by the Committee. *See* Plan Doc. at 12 ("The Company shall indemnify and hold harmless each member of the Committee from any and all claims, losses, damages, expenses (including counsel fees approved by the Committee) and liabilities (including any amounts paid in settlement with the Committee's approval, but excluding any excise tax assessed against any member or members of the Committee pursuant to the provisions of Code Section 4975) arising from any act or omission of such member in connection with duties and responsibilities under the Plan, except where the same is judicially determined to be due to the gross negligence or willful misconduct of such member.").

24.     During the Class Period, the Committee is/was a fiduciary of the Plan under ERISA, as individuals or entities that exercise discretionary authority over management or disposition of plan assets are considered fiduciaries. The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan assets.

25.     Accordingly, CenterPoint during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

26.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

## IV.    CLASS ACTION ALLEGATIONS[8]

27.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[9]

> All persons, except Defendant, the Company's Board of Directors, and the Committee, and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between August 7, 2018 through the date of judgment (the "Class Period").

28.    The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 11,990 Plan "participants with account balances as of the end of the plan year." *See* 2023 Form 5500 at 2.

29.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendant's mismanagement of the Plan. Defendant treated the Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

---

[8] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[9] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

30.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendant is/was a fiduciary of the Plan;

B.     Whether Defendant breached its fiduciary duties of prudence by engaging in the conduct described herein;

C.     Whether the Defendant failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

31.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

32.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of

other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

33.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

34.     Houston Industries Incorporated ("HII"), "established a tax-qualified defined contribution plan, effective July 1, 1973, for the benefit of its eligible employees (the "Saving Plan"), along with a trust, which formed a part of the Savings Plan." Plan Doc., at 1.

35.     Effective January 1, 1989, the Savings Plan was amended to comply with the requirements of Section 401(a) of the Internal Revenue Code of 1986, as amended by the Tax Reform Act of 1986, and Code Section 501(a) with respect to the underlying Savings Plan trust, and to make certain other changes. *Id.*

36.     Effective October 5, 1990, the Savings Plan was amended and restated to include an employee stock ownership plan ("ESOP") intended to qualify under Code Sections 401(a) and 4975(e)(7). *Id.*

37.     Effective July 1, 1995, the Savings Plan was amended and restated to make certain additional changes (the Savings Plan, as amended and restated effective July 1, 1995, and as thereafter amended and in effect on March 31, 1999, being herein referred to as the "Prior HII Plan"). *Id.*

38.     Effective August 6, 1997, as a result of a corporate merger, HII assumed the sponsorship of the NorAm Employee Savings & Investment Plan (the "NorAm Plan") and the

10

Minnegasco Division Employees' Retirement Savings Plan (the "Minnegasco Plan"), and adopted the underlying plan trusts. *Id*.

39.     Effective April 1, 1999, the NorAm Plan and Minnegasco Plan were merged with and into the Prior HII Plan, and the assets and liabilities under the NorAm Plan and Minnegasco Plan trusts were transferred to the Savings Plan trust, and the Prior HII Plan was amended and restated: (1) to reflect the same, (2) to incorporate all prior amendments to the Prior HII Plan, including the amendments incorporating certain changes required by the Retirement Protection Act of 1994 under the General Agreement on Tariffs and Trades, the Uniformed Services Employment and Reemployment Rights Act, the Small Business Job Protection Act of 1996 and the Tax Reform Act of 1997, (3) to reflect the change in the name of the Plan sponsor from Houston Industries Incorporated to Reliant Energy, Incorporated ("REI"), and (4) to make certain other changes to the Prior HII Plan (the "1999 Plan"), with such 1999 Plan subsequently amended to reflect the applicable provisions of the Community Renewal Tax Relief Act of 2000, the Economic Growth and Tax Relief Reconciliation Act of 2001 and the Job Creation and Worker Assistance Act of 2002. *Id*.

40.     Effective August 31, 2002, in connection with the spin-off of Reliant Resources, Inc. ("RRI"), a subsidiary of REI, and the resulting reorganization of REI, CenterPoint Energy, Inc. became the plan sponsor of the 1999 Plan, which was renamed the CenterPoint Energy, Inc. Savings Plan. *Id*.

41.     Effective January 1, 2009, the 2005 Plan was amended and restated to: (1) incorporate all prior amendments to the 2005 Plan, including the addition of automatic enrollment provisions for eligible employees hired on and after January 1, 2008, (2) change the employer

matching contribution formula, (3) satisfy the "safe harbor" plan requirements under Code Section 401(k)(12), and (4) make certain design changes, (the "2009 Plan"). *Id*.

42.     Effective, January 1, 2015, the 2009 Plan was amended and restated to (1) incorporate all prior amendments to the 2009 Plan, (2) amend the definition of "Spouse" to reflect the Supreme Court's decision regarding same-sex marriage in *United States v. Windsor* and to comply with IRS Notice 2014-19 and other guidance issued by the Internal Revenue Service concerning the same, and (3) make certain changes to the hardship withdrawal provision and confirm the limitation period to file a claim for benefits (the "2015 Plan"). *Id*.

43.     Effective January 1, 2016, the 2015 Plan was amended and restated to: (1) effective October 1, 2015, implement Roth deferral contribution features and comply with Code Section 402A, and (2) effective January 1, 2016, (a) revise the Plan's automatic enrollment provisions, (b) add partial distributions as an optional form of payment, (c) revise the Plan's provisions related to mandatory cash outs, (d) provide that contributions may only be made with respect to eligible compensation paid within 30 days of termination of employment, (e) add a period of limitation following final denial of a participant's benefit claim for purposes of filing a civil action, (f) clarify the determination of eligibility to participate in the Plan, (g) clarify the standard of judicial review applicable to Company Benefit Committee actions, (h) adopt certain restrictions on investment elections in the ESOP Company Stock Fund, and (i) provide the Chief Executive Officer of the Company with amendment authority, subject to certain limitations, (the "2016 Plan"). *Id*.

44.     Effective January 1, 2020, the Vectren Corporation Retirement Savings Plan (the "Vectren Plan") was merged with and into the 2016 Plan, the assets and liabilities under the Vectren Plan were transferred to the 2016 Plan trust, and the 2016 Plan was amended and restated

(1) to reflect the merger of the plans, (2) to incorporate all prior amendments to the 2016 Plan, and (3) to amend the hardship provisions of the 2016 Plan (the "Prior Plan"). *Id.*

45.     "The Plan is a defined contribution plan and it bases benefits solely on the amounts in each participant's individual account." SPD at 32; *see also* Independent Auditors' Report attached to 2023 Form 5500 at 6 ("The Plan is a defined contribution plan established in accordance with Sections 401(a) and 401(k) of the Internal Revenue Code of 1986, as amended (IRC), and is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA).").

### *Eligibility*

46.     In general, regular full-time employees are eligible to participate in the Plan from their first day of service. *See* SPD at 4 ("You are eligible to participate in the Savings Plan on your first day of work if you meet Plan eligibility requirements.").

### *Contributions*

47.     There are several types of contributions that can be added to a participant's account, including: a percentage of eligible pay each pay period on a pre-tax and/or a Roth 401(k) bases and a percentage of eligible pay each pay period with after-tax dollars. *See* SPD at 5.

48.     With regard to employee contributions in the Plan: "[p]articipants may make pre-tax and/or Roth contributions up to 50% of eligible compensation, not to exceed the Internal Revenue Service (IRS) limits as defined in the Plan." *See* 2023 Auditor Report at 6. CenterPoint "matches 100% of the first 6% of eligible compensation contributed by a Participant to the Plan (excluding catch-up contributions)." *See* 2023 Auditor Report at 6.

49.     Like other companies that sponsor 401(k) plans for their employees, CenterPoint enjoys both direct and indirect benefits by providing matching contributions to the Plan

participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

50.    CenterPoint also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

51.    Given the size of the Plan, CenterPoint likely enjoyed significant tax and cost savings from offering a match.

### *Vesting*

52.    Participants are immediately vested in all contributions whether they were made by the employee or whether the contribution was a matching contribution made by CenterPoint. *See* 2023 Auditor's Report at 8 ("Participants are vested immediately in their elective contributions plus earnings thereon. Participants, other than certain bargaining unit employees, are also immediately fully vested in all Company contributions and actual earnings thereon.").

### *The Plan's Investments*

53.    The Plan's assets under management for all funds as of December 31, 2023 was $2,601,997,411. *See* Schedule H, attached to 2023 Form 5500 at 2.

### *Payment of Plan Expenses*

54.    During the Class Period, administrative expenses, including recordkeeping fees, were paid for using the Plan's assets. *See* 2023 Auditor Report at 10.

## VI.    THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.    The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Failed to Administer the Plan in a Prudent Manner

55.     As described in the "Parties" section above, Defendant was a fiduciary of the Plan.

56.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).

57.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.

### 1.     Much Information Regarding the Costs of Plan Administration Services is in the Sole Possession of Plan Fiduciaries

***Plan Participants Lack Access to Section 408(b)(2) disclosures***

58.     In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [10]

59.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

60.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of

---

[10] *See* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf   ("DOL   408(b)(2) Regulation Fact Sheet")

the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet.

61.     The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

62.     A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

63.     Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants. Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

### *Plan Participants Lack Access to Requests For Proposals*

64.     As noted above, 408(b)(2) disclosures provided to plan sponsors and fiduciaries are generally not made available to plan participants. The same is true for Plaintiffs and this Plan, as Plaintiffs do not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

65.     Other information has also not been made available to Plaintiffs. For example, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees

being paid by other plans, as well as the recordkeeper RKA rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's RKA expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in RKA costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

66.    Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[11]

67.    Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information.

### *Plan Participants Lack Access to Meeting Minutes*

68.    Additionally, documentation of fiduciary fee monitoring is generally accomplished in the form of meeting minutes. Without proper documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

69.    In an attempt to discover the details of the Plan's mismanagement, on August 3, 2023, the Plaintiffs wrote to the Plan's administrator requesting, *inter alia*, meeting minutes from

---

[11] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

the Committee. By correspondence dated September 1, 2023, the Plan administrator denied this request.

70.     Although Plan participants received a Summary Plan Description (SPD) from Defendants, in response to their request for information, those SPDs do not transparently state the amount of fees or method for calculating fees, only that participants will be paying for the Plan's fees rather than the sponsor.

71.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

72.     In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendant's decision-making process with respect to the Plan, including Defendant's processes (and execution of such) for monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendant prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

73.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

74.    Defendant's breaches of its fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and recordkeeping fees which wasted the assets of the Plan and the assets of participants.

> **2.    Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable RKA Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Recordkeeping Fees**
>
>> **a.    Costs for RKA Services Vary Little for a Plan with a Substantial Number of Participants**

75.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

76.    There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

> A.    Recordkeeping;
>
> B.    Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

    C.      Administrative services related to converting a plan from one recordkeeper to another;

    D.      Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

    E.      Maintenance of an employer stock fund (if needed);

    F.      Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

    G.      Plan consulting services, including assistance in selecting the investment lineup offered to participants;

    H.      Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s (excluding the separate fee charged by an independent third-party auditor);

    I.      Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

    J.      Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

77.    This list of services includes many compliance-based tasks, which are imposed by the government uniformly amongst plans. Therefore, it is not possible for the quality of compliance reporting to vary, particularly in any significant fee-based way.

78.    This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless

of the services chosen or utilized by the plan. The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

79.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

A.    Loan processing;

B.    Brokerage services/account maintenance (if offered by the plan);

C.    Distribution services; and

D.    Processing of qualified domestic relations orders.

80.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

81.    The cost of providing recordkeeping services often depends on the number of participants in a plan. When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And, as the overall number of participants increases, the average cost per participant decreases. *See*, 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum

charges and sliding scales that substantially reduce per capita costs as plan size increases.").[12]
***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[13]

82.     In general, the level, number and character of participant services provided by the record keeper have minimal impact upon the costs of providing record keeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large, fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

83.     The incremental costs caused by additional participants may include: Mailing costs, if materials are delivered by mail versus Internet; telephone inquiries through an 800 number; check distributions from the 401(k) plan to the participant; and/or any in person or off line participant education and investment guidance requiring the personnel time of a record keepers staff member. This service is normally charged as an additional line-item cost.

84.     Although the 401(k) participant servicing can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan. ***Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.***

---

[12] *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.

[13] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013).

85.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

86.     As noted above, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services). These costs also do not materially change if the recordkeeper gains a new plan or loses an existing plan, and don't vary based on the amount of assets in the plan or in an individual's account.

87.     The way it works, in part, is that each participant's account incurs transactions such as contributions, distributions, asset allocation changes, and less frequently, loans and distributions and participant reports. Each participant's account balance is updated daily, reflecting the aforementioned activities as well as investment returns. In this manner a participant's account is somewhat similar to a simplified brokerage account with only a few investment positions. As a result, the cost of recordkeeping a participant's account with a balance of $500,000 is the same as for a participant whose account balance is $5,000 in the same plan.

>           **b.      Managed Account Services Are Among the Services A Recordkeeper Can Provide for Minimal costs**

88.     As noted above, Plan consulting services, including assistance in selecting the investment lineup offered to participants, are among the core services that recordkeepers provide to retirement plans. Managed accounts are investment services under which providers make investment

decisions for specific participants to allocate their retirement savings among a mix of assets, commonly referred to as asset allocation. Managed account providers in 401(k) plans limit the investment options they consider to those funds chosen by the plan sponsor to create Plan participants' asset allocations.

89.     Most managed account service providers utilize computer programs to create plan participants' asset allocations.

90.     In general, managed account services are investment services under which a participant pays a fee to have a managed account provider invest the participant's account in a portfolio of preselected investment options.

91.     Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." The United States Government Accountability Office ("GAO"), 401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts, at 14 (June 2014), available at https://www.gao.gov/assets/gao-14-310.pdf.

92.     Generally, two types of strategies are employed, "customized" or "personalized." Customized service—allocating a participant's account based solely on age or other factors that can be easily obtained from the plan's recordkeeper, such as gender, income, current account balance, and current savings rate; or personalized service, which purports to take into account additional personal information to inform asset allocations, such as risk tolerance or spousal assets. In practice, little to no material customization is provided to the vast majority of plan participants which results in no material value to most participants relative to the fees paid.

93.     Managed account services merely mimic the asset allocations available through a target date fund while charging additional unnecessary fees for their services. Indeed, customized or personalized managed accounts offer little to no advantage over lower-cost funds of funds, such as target-date funds, risk-based funds and balanced funds.

94.     Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the participant's account balance regardless of which investment approach they choose.

95.     The Plan participant has no control over the fee rate they are charged. The fee levels are determined at the Plan level through a contractual agreement between the service provider and the Plan fiduciaries.

96.     For at least the past decade, jumbo plans have been able to negotiate multiple facets of the fees charged by managed account providers. Managed account services are offered by covered service providers to increase the revenue they generate through their relationship with a retirement plan.

97.     As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds that provide the materially same service at a much lower cost. Vanguard reported in August 2013 that managed account services generally return less than or equal to the returns of Vanguard's lower-cost professionally managed allocation products, such as target-date funds, risk-based funds, and balanced funds.[14]

98.     Prudent fiduciaries should regularly monitor the amount of managed account service fees the plan is paying and ensure the fees are reasonable compared to what is available in the market for materially identical services. The most effective way to ensure a plan's managed account service fees are reasonable is to periodically solicit bids from other managed account

---

[14] Vanguard, Professionally Managed Allocations and the Dispersion of Participant Portfolios (Valley Forge, PA; August 2013).

service providers, stay abreast of the market rates for managed account solutions, and/or negotiate better rates with the managed account service providers.

### c.    The Plan's RKA Fees Were Excessive

99.    Throughout the Class Period, the Plan received RKA services from Voya Retirement Advisors, LLC and Voya Institutional Plan Services, both of which entities, upon information and belief, are members of the Voya family of companies (collectively "Voya").[15] Voya is a publicly traded company on the New York Stock Exchange (NYSE:VOYA).  Further, Alight Solutions and Tempo Holding Company LLC d/b/a Alight Solutions ("Alight") provided RKA services throughout the Class Period.

100.    During the Class Period, Voya was one of the top recordkeepers nationally as measured by assets being recordkept. For example, in 2020 Voya ranked number 6:

**2020 TOP PROVIDERS (RECORDKEEPERS)[16]**

| Top 10, by Total 401(k) Assets ($MM) | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

---

[15] Voya has served as the Plan's recordkeeper since 2017. *See* 2017-2023 Forms 5500. Alight also provided RKA services throughout the Class Period. Effective January 1, 2005, CenterPoint entered into a Trust Agreement with The Northern Trust Company ("Northern Trust") to, among other things, provide recordkeeping for the Plan. *See* CenterPoint Energy Savings Trust, Amended and Restated Effective January 1, 2005 ("2005 Trust Agreement").

[16] *See* https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/

101.    The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena.

102.    Voya is responsible for maintaining detailed records of the money in Plan participants' accounts, "including how much is contributed, how it is invested, what the earnings and/or losses have been and what amounts have been distributed." *See* SPD at 8.

### d.    The Plan's Recordkeepers Offered Routine Services

103.    The RKA services performed each year for the Plan during the Class Period were similar so we can look at the Schedule C to the Plan's Form 5500s. The Schedule C to the Plan's Form 5500s lists the following codes indicating the type of general services performed by Voya and Alight: 13, 14, 15, 16, 64. Below is a description of the recordkeeping and administration codes:

> 13 – Contract Administrator
>
> 14 – Plan Administrator
>
> 15 – Recordkeeping and information management (computing, tabulating, data processing, etc.)
>
> 16 – Consulting (general)
>
> 64 – Recordkeeping fees

*See* Instructions for the 2023 Schedule C (Form 5500) available at https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2023-instructions.pdf at 27-31. Again, the above services are not out of the ordinary of the services other national recordkeepers provide. Prior to 2022, the Plan's Form 5500 (see below) makes no meaningful distinction between the services

provided by Voya Retirement Advisors, LLC and Voya Institutional Plan Services. Each Voya entity provided administration services to the Plan. Moreover, any fees associated with other ancillary a la carte services performed by the recordkeepers would be negligible because it is on a participant-by-participant basis instead of plan-wide.

104. The chart below demonstrates the codes[17] associated with each recordkeeper:

| Year | Service Provider | Recordkeeping and Administration Code | Relationship |
|------|------------------|---------------------------------------|--------------|
| 2018 | Voya Retirement Advisors, (sic) LLC | 13 | NONE |
| | Voya Institutional Plan Services | 64 | NONE |
| | Alight | 16 | NONE |
| 2019 | Voya Retirement Advisors, LLC | 13 | NONE |
| | Voya Institutional Plan Services | 64 | NONE |
| | Alight | 16 | NONE |
| 2020 | Voya Retirement Advisors, LLC | 13 | NONE |
| | Voya Institutional Plan Services | 64 | NONE |
| | Alight | 15 | NONE |
| 2021 | Voya Retirement Advisors, LLC | 13 | NONE |
| | Voya Institutional Plan Services | 64 | NONE |
| | Alight | 15 | NONE |
| 2022 | Voya Retirement Advisors, LLC | 13 | PROFESSIONAL MANAGEMENT |
| | Voya Institutional Plan Services | 64 | RECORDKEEPER |
| | Alight | 14 | PLAN ADMINISTRATOR |
| 2023 | Voya Retirement Advisors, LLC | 13 | PROFESSIONAL MANAGEMENT |

---

[17] As reported in Schedule C of the Plans Form 5500s.

| | | | |
|---|---|---|---|
| | Voya Institutional Plan Services | 64 | RECORDKEEPER |
| | Alight | 14 | PLAN ADMINITSRATOR |

105.    Even though in 2022, the Form 5500 identified Voya Retirement Advisors as professional management, to the extent this refers to the managed account service provided to the Plan, the nature of the managed account service is within the job description of a recordkeeper.

106.    As noted above, operating a managed account service is fairly routine and automated. Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." The United States Government Accountability Office ("GAO"), 401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts, at 14 (June 2014), available at https://www.gao.gov/assets/gao-14-310.pdf

        **e.**      **The Plan's Recordkeeping Fees were/are Unreasonable When Benchmarked Against Similarly Situated Plans and Within the Context that Recordkeeping Fees Should Decline as Plan Size Increases**

107.    During the Class Period, the Plan's per participant total RKA fees[18] were as follows:

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| **Voya Retirement Advisors** | $1,480,587 | $1,890,664 | $2,013,393 | $2,369,225 | $1,874,523 | $1,751,629 |
| **Voya Institutional Plan Services** | $346,431 | $288,422 | $233,635 | $221,345 | $301,694 | $470,115 |
| **Alight** | $80,775 | $38,929 | $10,800 | $18,225 | $20,475 | $14,065 |
| **TOTAL** | $1,907,793 | $2,218,015 | $2,257,828 | $2,608,795 | $2,196,692 | $2,235,809 |

---

[18] As reported in Schedule H of the of the Plan's Form 5500s. These amounts also appear in Schedule C of the Form 5500s.

| Year | Participants (PP) | Total Direct Costs | Per Participant Charge (PPC) |
|------|-------------------|--------------------|------------------------------|
| **2018** | 9,802 | $1,907,793 | $194.63 |
| **2019** | 10,119 | $2,218,015 | $219.19 |
| **2020** | 11,417 | $2,257,828 | $197.76 |
| **2021** | 11,975 | $2,608,795 | $217.85 |
| **2022** | 12,390 | $2,196,692 | $177.30 |
| **2023** | 11,990 | $2,235,809 | $186.47 |

108.    At all times during the Class Period, the above fees were unreasonable. As noted above, a DOL study concluded that "[b]asic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases." Accordingly, the larger the plan, the lower the recordkeeping fee should be.

109.    To put things into perspective, when comparing retirement plan data, most publications utilize tranches. For example, the leading publication that collects 401(k) data is BrightScope/ICI. It categorizes plans in the following tranches:

EXHIBIT I.2

**Universe of 401(k) Plans**

Distribution of 401(k) plans, participants, and assets by plan assets or number of plan participants, 2018

| Plan assets | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| | *Number* | *Percent* | *Thousands* | *Percent* | *Billions of dollars* | *Percent* |
| Less than $1M | 343,108 | 58.5% | 6,007.5 | 8.4% | $107.1 | 2.1% |
| $1M to $10M | 208,789 | 35.6 | 13,660.6 | 19.1 | 620.7 | 12.2 |
| >$10M to $50M | 26,458 | 4.5 | 9,894.5 | 13.9 | 532.4 | 10.4 |
| >$50M to $100M | 3,564 | 0.6 | 4,808.0 | 6.7 | 247.1 | 4.8 |
| >$100M to $250M | 2,407 | 0.4 | 6,744.8 | 9.5 | 374.7 | 7.3 |
| >$250M to $500M | 1,034 | 0.2 | 5,395.1 | 7.6 | 362.1 | 7.1 |
| >$500M to $1B | 603 | 0.1 | 4,763.9 | 6.7 | 424.1 | 8.3 |
| More than $1B | 659 | 0.1 | 20,073.4 | 28.1 | 2,439.7 | 47.8 |
| All plans | 586,622 | 100.0 | 71,347.7 | 100.0 | 5,108.0 | 100.0 |

| Number of plan participants | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| | *Number* | *Percent* | *Thousands* | *Percent* | *Billions of dollars* | *Percent* |
| Fewer than 100 | 522,277 | 89.0% | 10,960.2 | 15.4% | $709.2 | 13.9% |
| 100 to 499 | 50,477 | 8.6 | 9,841.2 | 13.8 | 549.9 | 10.8 |
| 500 to 999 | 6,375 | 1.1 | 4,424.5 | 6.2 | 266.1 | 5.2 |
| 1,000 to 4,999 | 5,807 | 1.0 | 12,136.0 | 17.0 | 886.3 | 17.4 |
| 5,000 to 9,999 | 842 | 0.1 | 5,828.1 | 8.2 | 506.0 | 9.9 |
| 10,000 or more | 844 | 0.1 | 28,157.8 | 39.5 | 2,190.4 | 42.9 |
| All plans | 586,622 | 100.0 | 71,347.7 | 100.0 | 5,108.0 | 100.0 |

Note: Assets are fair market value at the year-end of the plan and include loans. The results exclude 403(b) plans with a 401(k) feature.

Source: BrightScope Defined Contribution Plan Database

*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex.

1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

Accordingly, the billion-dollar asset mark is significant as all plans over a billion dollars are

considered in a category of their own.

110.    Looking at recordkeeping costs for plans of a similar size during the Class Period

shows that the Plan was paying higher recordkeeping fees than its peers:

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost per participant[19] |
|---|---|---|---|---|---|---|---|
| Fidelity | Fortive Retirement Savings Plan | 2018 | $1,603,610,831 | 13,502 | 37, 64, 65, 71 | No | $35 |
| Fidelity | First American Financial Corporation 401(k) Savings Plan | 2018 | $1,467,500,582 | 15,554 | 37, 60, 64, 65, 71 | Yes - $0 | $21 |
| Great-West Life/ TIAA | Penn State Health 401(k) Savings Plan | 2018 | $1,256,621,892 | 14,150 | 64 | Yes - $0 | $20 |
| **Voya/Alight** | **CenterPoint Energy Savings Plan** | **2018** | **$2,108,802,293** | **9,802** | **13, 16, 64** | **No** | **$195** |
| | | | | | | | |
| Fidelity | First American Financial Corporation 401(k) Savings Plan | 2019 | $1,791,281,396 | 15,246 | 37, 60, 64, 65, 71 | Yes - $0 | $35 |
| Great-West Life/ TIAA | Penn State Health 401(k) Savings Plan | 2019 | $1,646,231,456 | 15,020 | 64 | Yes - $0 | $35 |
| **Voya/Alight** | **CenterPoint Energy Savings Plan** | **2019** | **$2,639,906,202** | **10,119** | **13, 16, 64** | **No** | **$219** |
| | | | | | | | |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15, 25, 50, 16, 26, 52, 21, 37, 57 | Yes - $0 | $23 |
| **Voya/Alight** | **CenterPoint Energy Savings Plan** | **2020** | **$2,748,709,467** | **11,417** | **13, 15, 64** | **No** | **$198** |
| | | | | | | | |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| Fidelity | Fortive Retirement Savings Plan | 2021 | $1,987,784,377 | 12,758 | 37, 64, 65, 71 | No | $34 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37, 60, 64, 65, 71 | Yes - $0 | $28 |
| **Voya/Alight** | **CenterPoint Energy Savings Plan** | **2021** | **$3,075,160,462** | **11,975** | **13, 15, 64** | **No** | **$218** |
| | | | | | | | |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2022 | $1,475,238,032 | 16,973 | 37, 60, 64, 65, 71 | Yes - $0 | $29 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2022 | $1,099,817,927 | 11,787 | 37, 60, 64, 65, 71 | Yes - $0 | $30 |

---

[19] Unless otherwise noted, these fees are taken from the Form 5500.

| Voya/Alight | CenterPoint Energy Savings Plan | 2022 | $2,373,434,811 | 12,390 | 13, 14, 64 | Yes - $0 | $177 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2023 | $1,837,546,518 | 18,163 | 37, 60, 64, 65, 71 | Yes - $0 | $32 |
| Fidelity | Fortive Retirement Savings Plan | 2023 | $1,915,519,824 | 13,503 | 37, 64, 65, 71 | Yes - $0 | $30 |
| Voya/Alight | CenterPoint Energy Savings Plan | 2023 | $2,601,997,411 | 11,990 | 13, 14, 64 | Yes - $0 | $186 |

111.    The similarities between the comparator plans and the Plan are not just limited to the assets under management and number of participants, although those figures are sufficient to make an adequate comparison given the RKA services are a commodity service with the true value of the services not changing from one plan to another. Here, the comparator plans altogether shared a majority of the service codes attributed to the Plan's RKA in the Form 5500s indicating the Plan and the comparator plans overwhelmingly utilized the same services. Further, neither the Plan nor the comparator plans received any additional indirect compensation for performing RKA services.

112.    To the extent the code 13 attributed to Voya Retirement Advisors in the Form 5500 referred to the Plan's managed account service, that service did not justify any material increase in the RKA costs to the Plan.

113.    First, Defendant could have offered the exact same managed account services at a lower cost by using a different managed account provider. As addressed below, Defendant failed to take advantage of the Plan's size to timely negotiate lower fees from its existing managed account service provider or Defendant could have obtained the materially same managed account services for less through another provider if it had solicited competitive bids for the same services.

114.    Second, Defendant could have utilized a target date fund instead of the managed account but did not do so. Here, for example, Plaintiff Brooks invested in the Target Retirement 2055 Fund making the use of the managed account redundant and unnecessary. Because all Plan

participants had available to them the target date funds it was unnecessary to offer Voya's managed account service. As the GAO recognized in its reports on managed accounts, "Similar advantages … can be achieved through other retirement investment vehicles outside of a managed account and without paying the additional managed account fee. For ex ample, in one recent study, a record keeper that offers managed accounts through its platform showed that there are other ways to diversify using professionally managed allocations, such as target date funds, which can be less costly." *See* GAO report.

115.    Third, Voya Retirement Advisors states in its welcome letter to Plan participants who elect the service that "Financial Engines Advisors LLC acts as a sub-advisor Voya Retirement Advisors, LLC." If Financial Engines is in fact performing the work of Voya, it underscores the fact that the fee charged by Voya for the managed account service is unreasonable because Voya itself is doing little to no work to justify its exorbitant fee.

116.    As a result, based on the value provided, the reasonable fee for the managed account service was zero or very close to zero, and the use of the managed account services provided by Voya cost the Plan at least $11.4 million from 2018 to 2023. *See* Tables at ¶ 107, *supra*.

117.    Of additional importance, even if some portion of the managed account service fee was warranted, the fees charged were grossly excessive. Voya's managed account service charged fees based on the amount of assets in a participants' Plan account rather than a per capita charge. This had the effect of increasing costs to Plan participants without an increase in service level. This is unreasonable.

118.    Plaintiff Brooks exemplifies the egregious nature of this fee structure which was implemented plan-wide. For illustration, in the fourth quarter of 2018, Mr. Brooks paid a managed

account fee of $35.74 based on assets under management of $26,447.54. In the fourth quarter of 2019 he paid a managed account fee of $58.43 based on assets under management of $55,341.79. Mr. Brooks held the identical investment funds in the fourth quarter of 2018 as the fourth quarter of 2019: Target Retirement 2055 Fund, Large Company Value Fund, S&P 500 Index Fund, Large Company Growth Fund, and International Equity Fund.  Thus, Mr. Brooks paid 61% more in fees in 2019 than in 2018 for the same exact service. For the year 2019 Mr. Brooks paid $190.64 for the managed account service: 1st quarter = $38.42; 2nd quarter = $43.83; 3rd quarter = $49.96; 4th quarter = $58.43. Each quarter his fee went up even though services stayed the same.

119.    From 2018 to 2023, the Plan paid an average of $199 per participant for RKA services. The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees by far. The Plan's $199 average per participant fee from 2018 to 2023 is almost seven times the average fee of $29 per participant from 2018 to 2023 for the 12 plans listed above. Thus, when looking at the RKA fees charged by Voya Retirement Advisors, LLC and Voya Institutional Plan Services either individually or collectively, the fees exceeded reasonable RKA rates charged by similarly situated plans.

120.    This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years of the Class Period.

121.    The Plan should have been able to obtain per participant recordkeeping fees in the mid to upper $20 range per participant from Voya no later than the start of the Class Period based on its size and the routine nature of the recordkeeping services performed by Voya. As noted above, Voya largely offers the same services to its 401(k) clients. Any services beyond the routine are billed on top of the core charges. This fee range is consistent with the average recordkeeping fees paid by the largest plans in the country as demonstrated in the allegations above.

122.   The Plan's fiduciaries should have further taken into consideration all revenue received by Voya from the Plan in determining whether the amounts being charged to the Plan participants were reasonable. Had the Plan fiduciaries conducted an adequate investigation they would have realized the Plan was overpaying Voya for RKA services.

123.   Moreover, the mid to upper $20 range per participant fee is not an exact fee that every Plan participant should have paid. To the extent Defendants collected recordkeeping fees through an asset-based percentage fee, the amount participants paid for recordkeeping fees was a function of a percentage level and the assets in each participant's account. Meaning, the actual amounts paid by Plan participants varied according to the assets in their accounts.

124.   A lower dollar amount paid in fees is primarily reflective of a low balance in the participant's account. Therefore, if the average per participant fee was reduced to the mid to upper $20 range, the pro rata rates for all participants, including those that were paying less than the mid to upper $20 range, would drop proportionally according to the lever of assets in their accounts.

### f.   Utilizing Two Recordkeepers Needlessly Disadvantaged the Plan

125.   Unlike the Plan, all but one of the lower-paying comparators plans in the chart in ¶110 uses only one recordkeeper.

126.   The outlier, the Penn State Health 401(k) Savings Plan, used two recordkeepers but still paid significantly lower recordkeeping fees than the Plan.

127.   Because all recordkeepers provide the same suite and quality of services, and base their pricing on participant size, prudent fiduciaries consolidate recordkeepers to reduce fees and offer more transparency to participants as well as fiduciaries.

128.   The use of two recordkeepers was neither necessary nor advantageous for the Plan. The service codes for Alight and Voya's services to the Plan show a duplication of services.

Compare Alight's codes: 14 [Plan Administrator], 15 [Recordkeeping and information management], 16 [Consulting (general)] with Voya's code 64 [Recordkeeping fees].

129.    Both recordkeepers are capable of providing each other's services and could operate as the sole recordkeeper for the Plan.

130.    Voya, as one of the leading recordkeepers, can offer an entire suite of services including the services Alight is providing the Plan and the Plan seeks. Voya's website provides this list of its "Full-service defined contribution" services:

- Recordkeeping
- Benefit administration
- Compliance and consulting
- Participant services and education
- Actuarial services
- "Streamlined administrative processes to lower overall plan expenses and consolidate data into a single source"
- Regulatory support
- Participant website
- Access to live support
- Employee education[20]

131.    Alight similarly prides itself on being in the top tier of recordkeepers, necessarily making Alight capable of offering the same suite and quality of services in order to remain competitive.[21]

132.    Prudent fiduciaries of plans not already using one recordkeeper investigate, and ultimately elect to use, one recordkeeper for all of their services. In fact, the use of one recordkeeper _**enhances**_ the level of service because it enhances the participant's experience.

---

[20] *See* https://www.voya.com/workplace-solutions/defined-benefit-plans Last Accessed November 13, 2024.

[21] *See* https://investor.alight.com/news/news-details/2023/Alight-ranked-as-a-top-U.S.-defined-contribution-record-keeper-by-Pensions--Investments/default.aspx  Last accessed November 13, 2024.

133.    Had the Plan's fiduciaries additions followed prudent processes, they would have discovered the advantages of using one recordkeeper, including a better participant experience and lower fees.

### 3.    There is No Indication Defendant Negotiated to Reduce the Plan's RKA Fees During the Class Period

134.    As noted above, 408(b)(2) disclosures are not available to plan participants. By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either. Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP.

135.    Here it appears the Defendants failed to conduct a RFP in the years leading up to the start of the putative Class Period. The fact that the Plan had the same recordkeeper in place, namely Voya, since 2017 with little meaningful change in the already excessive RKA rate plausibly suggests that the Plan fiduciaries failed to act in the best interests of Plan participants when they failed to genuinely attempt to seek a competitive market rate for RKA fees. Had Defendant genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

136.    At any point in the Class Period, the Plan's fiduciaries could have opted to conduct a RFP to any recordkeeper including any of the above top ten recordkeepers who were peers of Voya and capable of providing lower recordkeeping fees. Had Defendant sought an appropriate market rate through a RFP, it's likely either the recordkeeper would have been changed at some point or Voya would have agreed to charge much less per participant for RKA services throughout the Class Period.

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duty of Prudence**

137.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

138.    At all relevant times, the Committee and its members during the Class Period were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

139.    As indicated *supra*, throughout the Class Period and continuing to the present, the Company indemnifies the Committee against any liability arising from services provided by the Committee.

140.    As fiduciary of the Plan, the Committee was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

141.    The Committee breached these fiduciary duties in multiple respects as discussed throughout this Complaint. The Committee also failed to control the costs of the Plan's recordkeeping and administrative costs.

142.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses. Had the Committee complied with its fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

143.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), and the Company indemnification agreement, the Company is liable to restore to the Plan all losses caused by the Committee's breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

144.    The Company knowingly participated in each breach of the Committee, knowing that such acts were a breach, enabled the Committee to commit breaches by failing to lawfully discharge such the Company's own duties, and knew of the breaches by the Committee and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, Company is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries

145.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

146.    CenterPoint, through its Board of Directors, had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

147.    In light of this authority, the Company had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

148.    The Company also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial

resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company. The Company breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

149.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Company complied with its fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

150.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Company is liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendant on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendant has breached its fiduciary duties under ERISA;

D.      An Order compelling the Defendant to make good to the Plan all losses to the Plan resulting from Defendant's breaches of their fiduciary duties, including losses to the Plan resulting from imprudent monitoring of recordkeeping and administrative costs, and to restore to the Plan all profits which the participants would have made if the Defendant had fulfilled its fiduciary obligations;

E.      An order requiring the Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendant as necessary to effectuate said relief, and to prevent the Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendant from any further violations of its ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendant's illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: November 22, 2024          **CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
James A. Maro, Esquire
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
jamesm@capozziadler.com
(610) 890-0200
Fax: (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2024, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.


By: */s/ Mark K. Gyandoh*